1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8

9

10

11

12

13

| JAIRO ESPINOZA PALACIOS, et al., | CASE NO. 2:26-cv-491-JNW |
| Petitioners, | ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS IN PART |
| v. | |
| LAURA HERMOSILLO, et al., | |
| Respondents. | |

## 1. INTRODUCTION

14

15

16

17

18

19

20

21

22

23

This case involves eleven habeas petitioners, each held in custody by Immigration and Customs Enforcement (ICE) at the Northwest ICE Processing Center. When they first entered the United States, each Petitioner was detained near the border, then released either on parole or on an order of release on recognizance ("OREC"). Before their recent re-detention, the Government did not provide Petitioners with notice or an opportunity to be heard. Petitioners argue that the Government's actions violate their constitutional right to procedural due process.

The Court agrees and orders all Petitioners released, except Petitioner Rahim, who has asked that his petition be dismissed without prejudice, and Petitioner Rodriguez, who has withdrawn his Petition.

## 2.  BACKGROUND

### 2.1  The Intensive Supervision Appearance Program ("ISAP").

Because some of Petitioners' cases involve the Intensive Supervision Appearance Program ("ISAP"), the Court discusses it briefly at the outset. ISAP is an alternative to detention ("ATD") program, run by one or more companies that contract with ICE. *See* Dkt. No. 21 ¶¶ 163–164. As part of ISAP, non-citizens download an app onto their phones and use it to check in with an ICE contractor by sending photos. Failure to check in with a photo as directed using the ISAP app is considered an "ATD violation." *See id.* ISAP check-ins may also be in person. *See* Dkt. No. 8 ¶ 7. According to the Government, if a person fails to check in through ISAP, the contractor records the date and type of violation, then that information is "automatically pulled into an ICE database" for the agency to review. Dkt. No. 21 ¶ 164.

### 2.2  Jairo Espinoza Palacios.

Jairo Espinoza Palacios is a citizen of Honduras who left his home country with his family at age 13, after receiving threats from Mara Salvatrucha 13 (MS13). Dkt. No. 2 ¶ 1. He entered the United States in 2019, was briefly held in immigration custody, then released on an OREC with his father and sister. *Id.* ¶ 2. He later applied for asylum and received a work permit. Dkt. No. 2 ¶ 4. He works in

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS IN PART - 2

Florida, where he lives with his wife and one-year-old daughter. *Id.* ¶ 5. His asylum case is still pending, with his next court hearing scheduled for 2029. *Id.* ¶ 4.

On December 8, 2025, while Espinoza Palacios was traveling to visit a friend in Montana, he was pulled over by the police. *Id.* ¶ 6. The police reviewed his identification, told him that "everything was in order," and went back to their car. *Id.* However, as Espinoza Palacios went back to his car, he was approached by an ICE agent, who asked him what he was doing in Montana and if he was a U.S. citizen. *Id.* ¶ 7. He told the ICE agent that he is not a U.S. citizen and that he has a pending immigration case. *Id.* The ICE agent arrested him, and he was eventually taken to the Northwest ICE Processing Center, where he remains detained. *Id.* ¶¶ 7–8.

The Government submits the declaration of ICE Supervisory Detention and Deportation Officer ("SDDO") Brett Booth to support Petitioners' detention. According to SDDO Booth, ICE arrested Espinoza Palacios because he "had not updated his address with the immigration court in violation of the conditions of his release." Dkt. No. 21 ¶ 10. Apart from the hearsay statements of SDDO Booth, the Government provides no evidence of a supervised release violation.

### 2.3    Carmen Garrido Chavarria.

Chavarria is a citizen of Peru, who came to the United States because she feared for her life and safety if she remained in Peru. Dkt. No. 3 ¶ 1. She entered the United States in 2022, was taken into immigration custody, and was later released from custody on parole under INA § 212(d)(5)(A). *Id.* ¶ 2. After her release,

she moved to Anchorage, Alaska. *Id.* ¶ 3. She applied for asylum and, later, adjustment of status based on her marriage to a U.S. citizen. *See id.* ¶ 10.

On July 10, 2025, ICE agents approached and arrested Chavarria in the parking lot outside of her apartment building, as she was getting into her car. *Id.* ¶ 7. One of the agents called her a "Peruvian bitch" during the arrest. *Id.* The agents did not tell her why they were arresting her. *Id.* She was later transferred to the Northwest ICE Processing Center, where she remains detained.

SDDO Booth states that Chavarria was detained by ICE because she used fraudulent documents to gain employment in Alaska. Dkt. No. 21 ¶¶ 27–29. Apart from the hearsay statements of SDDO Booth, the Government provides no evidence to support this claim.

## 2.4    Evgenii Kurochkin.

Kurochkin is a Russian citizen, who left Russia with his wife in 2023 fearing religious persecution. Dkt. No. 4 ¶ 1. The Government detained Kurochkin on arrival and performed a credible fear interview. Finding he had a credible fear of persecution, the Government eventually released him from custody on February 5, 2024, under INA § 212(d)(5)(A). *Id.* ¶¶ 2–4. He and his wife applied for asylum, withholding of removal, and protection under the Convention Against Torture. *Id.* ¶ 4.

After his release, Kurochkin states that he complied with his conditions of release. *Id.* ¶ 5. To his knowledge, he has not missed a single check-in. *Id.* ¶ 6. He explains, "I have always kept the [ISAP] app from ICE on my phone. It sent me

reminders and video calls on home visit day, and I sent selfies as requested to the app every week. In the period from 9:00-11:00, a sound signal would come from the mobile application, and I would then immediately send a photo. I always sent photos on time in the app. I never received a notification of a violation of the requirements. Sometimes there were failures with the Internet or the program did not recognize my face. In these cases, I sent the photo again." *Id.*

On January 27, 2026, Kurochkin arrived for a regularly scheduled check-in, and he was told to go to the ICE office in Tukwila. *Id.* ¶ 11. When he arrived, an agent took his Employment Authorization Document and told him to go to a separate room, where he was arrested. *Id.* While the agents allowed him to call his wife, they did not allow him to call his attorney—despite his many requests—for several hours. *Id.* ICE detained Kurochkin at the Northwest ICE Processing Center, and the following day, January 28, told him that he had been arrested for violating his conditions of release. *Id.* ¶ 12. He states that this notice was the first time he had heard of any violations. *Id.* He has been detained at the Northwest ICE Processing Center since then. *Id.*

SDDO Booth suggests that Kurochkin was arrested and re-detained on January 27, 2026, because the ATD violation database indicates that "his device had missed a callback on February 5, 2024," Dkt. No. 21 ¶ 164, the same day he was released from ICE custody on conditions, Dkt. No. 4 ¶ 4. Again, the Court has no evidence to review that would support this alleged violation, apart from SDDO Booth's hearsay statements.

1

**2.5    Zemical Mhret.**

2        Mhret is a citizen of Eritrea who left his home country fearing torture. Dkt.

3  No. 5 ¶ 1. He entered the United States in January 2019 at the Laredo, Texas port

4  of entry. *Id*. ¶ 2. Immigration officers detained him at the border, and he remained

5  in ICE custody for two years, after which he was released on humanitarian parole.

6  *Id*. After his release, he applied for asylum, withholding of removal, and relief under

7  the Convention Against Torture. *Id*. ¶ 4. The Immigration Court in San Antonio,

8  Texas, denied Mhret's applications for asylum and withholding of removal, but

9  granted his application for withholding under the Convention Against Torture.

10  Mhret appealed the Immigration Court's denial of his asylum and withholding of

11  removal applications, and he later received a work permit. Mhret states that he

12  "was not aware of any [ICE] requirements beyond monitoring his appeal after he

13  was granted CAT protection." *Id*. He moved to Seattle in January 2025, where he

14  works as a cashier. *Id*. ¶ 6.

15        In December 2025, ICE agents arrested Mhret while he was sitting in his car

16  in a parking lot. *Id*. They did not explain why he was being arrested or detained. *Id*.

17  Mhret has since been detained at the Northwest ICE Processing Center. *Id*.

18        SDDO Booth asserts that ICE arrested Mhret because he moved to

19  Washington State in violation of his conditions of release. Dkt. No. 21 ¶ 155. But

20  the Government presents no evidence that Mhret was subject to conditions of

21  release, except for SDDO Booth's conclusory, hearsay statement that Mhret violated

22  his conditions of release—whatever they were. Indeed, the only document the Court

23  has is Mhret's humanitarian parole document, which does not include any

1
2

conditions of release, except that he must keep the document on his person. Dkt. No. 22-5.

3
4

**2.6    Amare Mitiku.**

5
6
7
8
9
10
11
12
13
14

Mitiku is a citizen of Ethiopia who fled his home country for fear of persecution based on his ethnicity, political views, and social activity. Dkt. No. 6 ¶ 1. He states that he has been tortured in Ethiopia based on his ethnicity and political activity, and that the Ethiopian Government considers him a political threat. *Id*. When he entered the United States in 2024, ICE detained him. *Id*. ¶ 2. Mitiku was eventually released on parole. *Id*. Upon release, ICE issued him a Form G-56, instructing him to report to the ICE local office in Seattle on December 11, 2024. ICE did not serve him a Notice to Appear at that time, nor did it place him in removal proceedings. *Id*. Mitiku states that when he appeared at his Seattle check-in as instructed, "the check-in proceeded without issue, and [he] was given a next reporting date of June 13, 2025." *Id*. ¶ 3.

15
16
17
18
19
20
21
22
23

Because the Government had not placed him in removal proceedings, Mitiku affirmatively filed for asylum with USCIS. *Id*. ¶ 4. On June 13, 2025, ICE arrested Mitiku at his scheduled check-in. *Id*. ¶ 5. He explains, "I was in shock, as I had complied with all instructions and had done nothing wrong. I explained that I had a pending affirmative asylum application and showed them my asylum receipt and biometrics notices, but they refused to consider this information." *Id*. After Mitiku was detained, he learned that USCIS had terminated his asylum application, stating that DHS records indicated that he had been placed in expedited removal

and issued a Form I-860. *Id.* ¶ 4. But Mitiku states he was never served with an

expedited removal order or a Form I-860. *Id.*

SDDO Booth asserts that ICE re-detained Mitiku to "effectuate" the

purportedly final expedited removal order. Dkt. No. 21 ¶ 139. But after Mitiku's re-

detention, he received a positive credible fear finding, was issued a Notice to

Appear, and was placed in removal proceedings, during which an immigration judge

granted his application for relief. *Id.* ¶¶ 140–142. DHS appealed that decision to the

BIA, and the appeal remains pending. *Id.* ¶ 142.

The Government has submitted no documentation related to Mitiku's case for

this Court to review, except for his parole notice form. Dkt. No. 22-4.

**2.7    Faiz Mounther.**

Mounther is a Syrian citizen who came to the United States in 2023 to seek

safety. Dkt. No. 7 ¶ 1. He was detained for about a month at the border, where he

passed a credible fear interview. After that, he was released with § 212(d)(5)(A)

parole and a Notice to Appear. *Id.* ¶ 2. Mounther eventually moved to Oregon to live

near his brother, where ICE gave him a new order of release. *Id.* ¶ 3. He applied for

asylum, and his application was accepted by the Portland Immigration Court on

January 23, 2024. *Id.* ¶ 4. He had a future court date scheduled in Portland for

2026. *Id.* But on December 11, 2025, ICE arrested him. *Id.* ¶ 9. Mounther remains

detained at the Northwest ICE Processing Center, where he states that he is not

receiving necessary medical care or adequate nutrition. Additionally, because he

1  was arrested without his glasses and has not been provided with glasses since his

2  arrest, he struggles to see. *Id.* ¶¶ 9–10.

3      SDDO Booth asserts that ICE arrested Mounther on December 11, 2025,

4  because he "failed to report per his OREC requirements on March 3, 2025." Dkt.

5  No. 21 ¶¶ 126–27. The Government has submitted no documentation to support this

6  alleged violation, nor has it submitted a declaration from anybody with personal

7  knowledge of the violation.

8  **2.8    Eduardo Penzo Croechez.**

9      Penzo Croechez fled his home country of Venezuela with his family seeking

10  safety. Dkt. No. 8 ¶ 1. He explains he had been the victim of extortion and

11  kidnapping by Venezuelan law enforcement. *Id.* On December 16, 2023, Penzo

12  Croechez and his family presented themselves at the border to seek asylum. *Id.* ¶ 2.

13  ICE detained them for about three days, then released them with a Notice to

14  Appear in Immigration Court and directed them to report to the ICE office in

15  Yakima, Washington. *Id.* The family moved to Yakima, reported to the ICE office

16  there, and applied for asylum. *Id.* ¶¶ 2–3. Penzo Croechez obtained an Employment

17  Authorization Document and worked legally at a warehouse packing apples in

18  Yakima.

19      Nevertheless, ICE arrested Penzo Croechez when he checked in for a

20  scheduled appointment on January 23, 2026. He states that the only reason the

21  agents provided for his arrest was that "[he] was in the country illegally." *Id.* ¶ 8.

22  Penzo Croechez is detained at the Northwest ICE Processing Center.

23

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS IN PART - 9

1    SDDO Booth asserts that Penzo Croechez was arrested for ATD violations—

2   failures to check in using the ISAP app. Dkt. No. 21 ¶ 113. But the Government

3   provides no documentation to support these alleged violations. And Penzo Croechez

4   contests them; he states, "At my last ISAP in-person appointment in September

5   2025, Jesus Nieto with ISAP said that I had no faults or misses in their system. At

6   this meeting, he changed our check-ins for once a month at the ICE office instead of

7   weekly check-ins with the ISAP application." Dkt. No. 8 ¶ 7.

8   **2.9    Hellen Sharp Perez.**

9        Sharp Perez is a Nicaraguan citizen who left her country fearing political

10   persecution. Dkt. No. 11 ¶ 1. Seeking asylum, she turned herself in at the U.S.

11   border in July 2022. *Id*. ¶ 2. She recalls being detained near the border for about

12   two days before release, and she believes she was released on humanitarian parole.

13   *Id*. She explains, "They gave me a special telephone to do check-ins with

14   immigration." *Id*. She states that while she was sometimes late in sending the

15   photos, she always sent them on the same day they were requested. *Id*. ¶ 3. After

16   her release, Sharp Perez moved to Miami to live with her mother, sister, and her

17   partner with whom she later had two children. *Id*. ¶ 4. She worked with a Catholic

18   charity to apply for asylum and a work permit. *Id*. ¶ 5.

19        Sharp Perez states that her (now former) partner was abusive and that he

20   falsely accused her of domestic violence. *Id*. ¶ 7. She was arrested for domestic

21   violence in Miami in October 2025, and she was held until the charges were dropped

22   the next month. *Id*. ¶ 8. After the State dropped the charges against her, ICE

23

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS IN PART - 10

detained her, rotating her through several different detention centers in Florida.

Eventually ICE transferred Sharp Perez to a detention center in Mesa, Arizona. *Id*.

¶¶ 10–11. She describes her detention in Mesa as follows:

> Then I was brought to Mesa, Arizona where I was made to sleep on the ground, and only given bread to eat and no water. They told me to drink from the sink. In detention, I was still experiencing the effects of giving birth and I was bleeding a lot. When they transferred me to a new detention center, I would have hemorrhaging. I had to use four sanitary napkins at once because I was bleeding so much. In Mesa, the guards would only give me one sanitary napkin and when I would ask for more they would refuse. My cell mates tried to help by getting in line and requesting sanitary napkins for themselves so they could give them to me. Once in Mesa, my uniform was soaked with blood because of the hemorrhaging. The other women asked for a change of uniform clothes for me but the guards refused. I had to take off my clothes so that I could wash them myself, while I was half naked.

*Id*. ¶ 11. From Mesa, Sharp Perez was transferred to California, Texas, back to

Mesa, and then to the Northwest ICE Processing Center in Tacoma. *Id*. ¶¶ 12–13.

Regarding Sharp Perez's arrest, SDDO Booth states only that "[d]ue to

Petitioner's arrest ERO made the determination to place a detainer on the

Petitioner on October 15, 2025." Dkt. No. 21 ¶ 65. SDDO Booth also confirms that

the domestic violence charges against Sharp Perez have been dismissed. *Id*. ¶¶ 62,

64.

## 2.10   Ghezae Ukbagabir.

Ukbagabir is a citizen of Eritrea who left his country fearing persecution.

Dkt. No. 12 ¶ 1. He entered the United States in July 2024 and was detained at the

border for a couple of days. *Id*. ¶ 2. He was then sent to Otay Mesa, then to

Mississippi. *Id*. In August, he had a credible fear interview and was determined to

have a credible fear of persecution in Eritrea. *Id*. ¶ 3. ICE then released him on parole. *Id*. Ukbagabir explains that he complied with his conditions of release, including by regularly checking in with ICE as required. *Id*. ¶¶ 4–5. He applied for asylum with the Seattle Immigration Court, and his final hearing was scheduled for January 2029, in Seattle. *Id*. ¶ 6. But on January 14, 2026, ICE arrested Ukbagabir when he attended his regular reporting appointment. *Id*. ¶ 7. He states he was not told the reason for his arrest. *Id*. Ukbagabir is detained at the Northwest ICE Processing Center.

SDDO Booth asserts that Ukbagabir failed to check in using the ISAP app, and so "ERO determined [he] was not complying with his ATD and terminated it" when he attended his in-person check in. Dkt. No. 21 ¶ 51. Apart from SDDO Booth's hearsay statements, the Court has no evidence before it to support the alleged violations.

### 3.  LEGAL STANDARDS

Federal courts have authority to grant writs of habeas corpus to any person held "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Habeas corpus "entitles [a] prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law." *Boumediene v. Bush*, 553 U.S. 723, 779 (2008) (quoting *INS v. St. Cyr*, 533 U.S. 289, 302 (2001)). "The essence of habeas corpus is an attack by a person in custody upon the legality of that custody," and thus to warrant relief, a petitioner must demonstrate that his detention is unlawful. *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973); *see Lambert v. Blodgett*,

393 F.3d 943, 969 n.16 (9th Cir. 2004). A district court's habeas jurisdiction extends to challenges to immigration-related detention. *Demore v. Kim*, 538 U.S. 510, 517 (2003); *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001).

In addition to habeas relief, federal courts have "long recognized the existence of an implied cause of action through which plaintiffs may seek equitable relief to remedy a constitutional violation." *Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020). "Where habeas petitioners raise Due Process claims and have also invoked the Court's jurisdiction under 28 U.S.C. § 1331, the Court has 'the authority both to entertain [the petitioner's] constitutional challenges and to grant injunctive relief in response to them,' 'irrespective of the accompanying habeas petition.'" *Francisco Lorenzo v. Bondi*, Case No. 2:25-cv-02660-LK, 2026 WL 237501, at *6 (W.D. Wash. Jan. 29, 2026) (quoting *Roman*, 977 F.3d at 941–42).

A plaintiff seeking a permanent injunction must demonstrate "(1) that [he] ha[s] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

## 4.  DISCUSSION

### 4.1  Revocation of release and re-detention must comport with due process, regardless of the detention statute that applies.

The Government's return includes several pages of detached, boilerplate language outlining detention statutes 8 U.S.C. §§ 1225(b)(1), 1225(b)(2), and

1226(a). Dkt. No. 20 at 2–8. The Court clarifies that the Due Process Clause applies

to Petitioners—who were deprived of their liberty when ICE revoked their release

and re-detained them— regardless of whether they are subject to detention under

Section 1225(b)(1), Section 1225(b)(2), or Section 1226(a). Courts in this District

have consistently so held.[1]

The Government cites *Buenrostro-Mendez v. Bondi*, No. 25-20496, 2026 WL

323330 (5th Cir. Feb. 6, 2026) for the proposition that noncitizens "who are present

without admission in the United States are 'applicants for admission'" under

Section 1225(a)(1) and thus subject to mandatory detention under Section

1225(b)(2). But *Buenrostro-Mendez* is neither binding on this Court nor persuasive

---

[1] *See, e.g.*, *Osuna Benitez v. Hermosillo*, Case No. 2:25-cv-02535-BAT, 2025 WL 3763932, at *3 (W.D. Wash. Dec. 30, 2025) (citing *Zadvydas v. Davis*, 533 U.S. at 693); *see also Pinchi v. Noem*, 792 F. Supp. 3d 1025, 1032 (N.D. Cal. 2025) ("[E]ven when ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody she has a protected liberty interest in remaining out of custody."); *Ramirez Tesara v. Wamsley*, 800 F. Supp. 3d 1130, 1137 (W.D. Wash. 2025) (quoting *E.A. T.-B v. Wamsley*, 795 F. Supp. 3d 1316, 1322 (W.D. Wash. 2025)) ("[T]he fact 'that the Government may believe it has a valid reason to detain Petitioner does not eliminate its obligation to effectuate the detention in a manner that comports with due process.'"); *Arrioja Blanco, et al. v. Hermosillo, et al.*, Case No. C26-493-MLP, 2026 WL 548056, at *2 (W.D. Wash. Feb. 27, 2026) ("Courts have held that noncitizens paroled or released from § 1225(b) custody retain a protected liberty interest in continued release and are entitled to procedural safeguards before being returned to custody, regardless of whether § 1225(b)(1) or (b)(2) applies."); *Bealter Reyes et al. v. Hermosillo et al.*, Case No. 2:26-cv-00270-TLF, 2026 WL 507678, at *2 (W.D. Wash. Feb. 24, 2026) ("[T]he Court need not consider whether there is a statutory basis . . . upon which petitioners may be lawfully detained . . . because even assuming a statute permits government detention of an individual, the Due Process Clause may provide procedural protections not found in the statue."); *P.T. v. Hermosillo*, Case No. C25-2249-KKE, 2025 WL 3294988, at *2 n.1 (W.D. Wash. Nov. 26, 2025) ("To the extent that the Government's briefing suggests that Section 1225(b) should be the beginning and end of the Court's inquiry, this position is emphatically rejected.").

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS IN PART - 14

because, as the dissent notes, "[t]he overwhelming majority of courts in [the Fifth Circuit] and elsewhere have recognized that the government's position [on 8 U.S.C. § 1225(b)(2)(A)] is totally unsupported." 2026 WL 323330, at *10; *see Safi v. Noem*, No. 2:26-cv-00308-TLF, 2026 WL 445564, at *2 n.2 (W.D. Wash. Feb. 17, 2026) (*Buenrostro-Mendez* is not binding and "is inconsistent with this Court's view of the statutory text and relevant Ninth Circuit and Supreme Court authority interpreting it").

Accordingly, the Court addresses the Petitioners' constitutional challenge, regardless of the statute the Government claims to have invoked to detain them.

**4.2    Petitioners' re-detention without notice and a pre-deprivation hearing violates procedural due process.**

Petitioners' detention violates due process because ICE revoked their release and re-detained them without notice and a pre-deprivation hearing.

To determine what process the Government must provide before depriving a person of a constitutionally protected interest, courts apply the test set out in *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976). They weigh: (1) the private interest at stake; (2) the risk of erroneous deprivation through existing procedures and "the probable value, if any, of additional or substitute procedural safeguards"; and (3) the Government's interest, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id*. at 335. This Court has applied that test in materially similar circumstances and found that due process requires pre-deprivation notice and a hearing before revoking a noncitizen's release order and re-detaining them.

*See Ledesma Gonzalez*, Case No. 2:25-cv-01404-JNW-GJL, 2025 WL 2841574, at *7 (W.D. Wash. Oct. 7, 2025). The weight of persuasive authority is in accord.[2]

The Court finds no reason to distinguish Petitioners' cases from similar cases in which ICE revoked orders of supervision without providing pre-deprivation notice or an opportunity to be heard. Considering the first *Mathews* factor, Petitioners have a strong liberty interest in not being detained. Indeed, "Petitioner's interest in not being detained is 'the most elemental of liberty interests.'" *Osuna Benitez*, 2025 WL 3763932, at *3 (quoting *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004)); *Zadvydas*, 533 U.S. at 690 ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty [the Due Process Clause] protects."). That liberty interest exists even when release is conditional and must be afforded substantial weight. *Doe v. Becerra*, 787 F. Supp. 3d 1083, 1093 (E.D. Cal. Mar. 3, 2025) (collecting cases); *see also Saelee*, 2026 WL 221513, at *4 (finding that the Government's allowance of a petitioner to

---

[2] *See, e.g.*, *Aslan v. Wamsley et al.*, Case No. 2:25-cv-02698-JNW, 2026 WL 238675, at *3 (W.D. Wash. Jan. 29, 2026) (citing *E.A. T.-B.*, 795 F. Supp. 3d at 1324 (applying *Mathews*, 424 U.S. at 332)); *Tessema v. Bondi,* No. C25-2330-JNW-MLP, 2025 WL 4033288, at *1 (W.D. Wash. Dec. 11, 2025), report and recommendation adopted, No. C25-2330-JNW-MLP, 2026 WL 84922 (W.D. Wash. Jan. 12, 2026); *Pineda v. Chestnut*, No. 1:25-cv-01970-DC-JDP (HC), 2026 WL 25510, at *5 (E.D. Cal. Jan. 5, 2026) ("Although Respondents allege in their opposition that Petitioner repeatedly violated the terms of her release [citation omitted], no neutral arbiter has determined whether those facts show that Petitioner is a flight risk or danger to the community."); *Tesara v. Wamsley*, Case No. C25-1723-KKE-TLF, 2025 WL 3288295, at *1, *6 (W.D. Wash. Nov. 25, 2025) (even when it alleges supervised release violations, the Government must provide notice and a pre-detention hearing to comply with due process); *Ledesma Gonzalez*, 2025 WL 2841574, at *8–9.

remain in the community for over eleven years on an Order of Supervision "only strengthens this interest").

Second, without notice and a pre-deprivation hearing, the risk of erroneous deprivation is high. For example, some Petitioners were purportedly re-detained for violating conditions of their release by failing to check in through the ISAP app. But based on the record, it appears that the app may not have functioned correctly at times, despite Petitioners' efforts to check in. Ultimately, factual disputes like these "should be resolved at a pre-deprivation hearing, rather than resolved after the fact by this Court." *Tesara*, 2025 WL 3288295, at *5; *Ramirez Tesara*, 800 F. Supp. 3d at 1137 (discussing factual disputes in another case involving alleged ATD violations based on ISAP check-ins).

The risk of erroneous deprivation is further highlighted here, where the Government has provided *no documentation* related to the revocation of Petitioners' release or their detention. Indeed, the only documents the Government has submitted are Petitioners' ORECs and notices of parole; the Government cannot fully describe—much less substantiate—the alleged violations that purportedly triggered Petitioners' re-detention. *See Ramirez Tesara*, 800 F. Supp. 3d at 1137. The Court notes that SDDO Booth's declaration is based on his review of "various records and systems maintained by ICE in the regular course of business," Dkt. No. 21 ¶ 3, rather than personal knowledge of Petitioners' specific circumstances. Even assuming the declaration is admissible, its conclusory assertions underscore the risk of erroneous deprivation when no hearing is held.

Third, "the Government's interest in re-detaining non-citizens previously released without a hearing is low." *Ledesma Gonzalez*, 2025 WL 2841574, at *8 (citing *E.A. T.-B.*, 2025 WL 2402130, at *5). The Government does not state that it will face any fiscal or administrative burdens if required to provide pre-deprivation process. *See* Dkt. No. 20 at 10–11. Rather, it argues that it has an interest in "protecting immigration proceedings from unnecessary delay." Dkt. No. 20 at 11. But this argument is nonsensical, as Petitioners' immigration cases can proceed without Petitioners' detention, as they have for years. The Government also asserts that it has a strong interest in preventing non-citizens from remaining in the United States in violation of the law. *Id.* But that interest is not implicated here, where Petitioners' *detention* is at issue—not their removal from the United States. *Cf. Shinwari v. Hermosillo*, Case No. 2:26-cv-00009-RAJ, 2026 WL 262605, at *4 (W.D. Wash. Jan. 30, 2026) (quoting *E.A. T.-B.*, 795 F. Supp. 3d at 1324) (finding this interest "not threatened" by a pre-deprivation hearing). In sum, due process requires notice and a pre-detention hearing here, as it does in similar cases.

The Court rejects the Government's arguments to the contrary. First, the Government argues that the Petitioners who were released on parole had constitutionally sufficient pre-deprivation notice because their parole automatically expired on given dates. For this argument, the Government relies on the form language it uses when granting parole "under section 212(d)(5)(A) of the Immigration and Nationality Act," which states (emphasis added):

> Your parole authorization is valid for one year beginning from the date on this notice and will automatically terminate upon your departure or removal from the United States or at the end of the one-year period *unless ICE provides you with an extension at its discretion . . . .*
>
> Parole is conditioned on you complying with the terms and conditions of your release.

Dkt. Nos. 22-1 at 2 (Garrido-Chavarria, dated 10/17/2022); 22-2 at 2 (Ukbagabir, dated 10/1/2024); 22-4 at 2 (Mitiku, dated 11/12/2024); 22-6 at 2 (Kurochkin, dated 02/05/2024).[3]

But ICE did not arrest any of the paroled Petitioners when their parole expired. Nor does the Government state that it re-detained Petitioners *because* their parole expired. Rather, ICE states that it re-detained petitioners for alleged violations of their conditions of release. Thus, ICE exercised its discretion to continue Petitioners' conditions of release past the automatic expiration of their parole. Moreover, as other courts in this district have found, the fact "[t]hat the express terms of the parole notice allowed for discretionary termination or expiration does not somehow obviate the need for the Government to provide an individualized hearing prior to re-detaining the parolee." *Shinwari*, 2026 WL 262605, at *4 (quoting *Ramirez Tesara*, 800 F. Supp. 3d at 1136). Accordingly, the Court rejects the Government's parole expiration argument.

---

[3] Sharp Perez and Mhret also received humanitarian parole. Sharp Perez's humanitarian parole extended from July 1, 2022, through August 21, 2022, and does not include any of the above language. Dkt. No. 22-3 at 2. Mhret's humanitarian parole form does not include an end date or any of the language above. Dkt. No. 22-5.

Next, citing *Zinermon v. Burch*, 494 U.S. 113, 128 (1990), the Government contends there are special cases in which pre-deprivation hearings are impracticable and can be dispensed with.[4] Another court in this district has rejected that argument, and this Court adopts that reasoning:

> *Zinermon* does not suggest there *may be special cases*; rather, it discusses a single, discrete "special case" known as "the *Parratt* rule" . . . . The *Parratt* rule applies to a unique subset of deprivations where there is no practical way that "predeprivation procedural safeguards *could* address the risk of deprivations" because the nature of the deprivation is such that it cannot be foreseen by the state . . . Under the unusual circumstances where pre-deprivation process is not practicable "because of the random and unpredictable nature of the deprivation" at issue, the *Parratt* rule holds that a tort remedy provides the process that is due.

*Sarwari*, 2026 WL 279968, at *4 (quoting *Zinermon*, 494 U.S. at 132) (emphasis added). "The *Parratt* rule obviously does not apply here" either. *Id.* at *5. Petitioners' re-detentions were not random or unforeseeable. Four Petitioners were detained at their own scheduled check-ins, and the remainder were arrested through planned enforcement operations.

The Government also cites *Safi v. Noem*, No. 2:26-cv-00308-TLF, 2026 WL 445564 (W.D. Wash. Feb. 17, 2026), for the proposition that post-deprivation hearings may suffice. But *Safi* involved a petitioner who was apprehended 800 feet from the Canadian border after admitting he was attempting an unlawful crossing,

---

[4] Notably, *Zinermon* held that after applying the *Mathews* test, the Supreme Court "usually [holds] that the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *Id.* at 127 (emphasis in original). Nevertheless, in this district, the Government has recently started to argue that under *Zinermon*, pre-deprivation hearings are not required for the re-detention of certain immigration habeas petitioners. *See, e.g.*, *Sarwari v. Wamsley*, Case No. 2:26-cv-00121-TL, 2026 WL 279968 (W.D. Wash. Feb. 6, 2026).

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS IN PART - 20

and who had previously been detained under similar circumstances at the Canadian border. *Id*. at *4. Even on those extraordinary facts, the *Safi* court found that due process required a hearing with clear-and-convincing-evidence protections; it simply held the hearing could occur "promptly" after detention rather than before. No Petitioner in this case presents remotely comparable circumstances.

It is undisputed that Petitioners did not receive notice or pre-detention hearings before the revocation of their release and their re-detention. A "post-deprivation hearing cannot serve as an adequate procedural safeguard because [it occurs] after the fact and [thus] cannot prevent an erroneous deprivation of liberty." *E.A. T.-B.*, 795 F. Supp. 3d at 1324. Accordingly, Petitioners' detention violates procedural due process, and they must be released.

## 4.3    The Government must follow the law if it re-detains Petitioners.

Having found due process violations, the Court further finds that issuing the requested injunctive relief is appropriate. Each of the four *eBay* factors supports this conclusion. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

First, Petitioners have suffered irreparable harm and such harm is likely to continue or recur absent injunctive relief to protect against further constitutional violations. ICE has already detained them without process, and they have been identified as targets for detention. Moreover, for months, courts in this district have repeatedly found that the Government's conduct in revoking release and re-detaining non-citizens without pre-deprivation process is unconstitutional. The Government has chosen to "respectfully disagree" with those orders and to continue

its current practices. Thus, the Court agrees with Petitioners that the Government has expressed "an avowed intention to continue the challenged conduct." Dkt. No. 23 at 7. Absent injunctive relief, Petitioners may be subject to the same due process violation again. *See eBay*, 547 U.S. at 391. Second, monetary damages are inadequate to remedy the deprivation of liberty, and third, requiring the Government to follow constitutional procedures imposes no undue hardship. Lastly, the public interest favors compliance with the law.

Several courts in this district have granted similar relief under comparable circumstances. *See, e.g.*, *Nguyen v. Bondi*, No. 2:25-CV-02723-RAJ, 2026 WL 183819 (W.D. Wash. Jan. 23, 2026), *6; *Wana v. Bondi*, No. 25-cv-2321, 2025 WL 3628634, at *6 (W.D. Wash. Dec. 15, 2025) (prohibiting re-detention without notice and hearing); *Tzafir v. Bondi*, No. 25-CV-02067-JHC-SKV, 2026 WL 74088, at *5 (W.D. Wash. Jan. 9, 2026) (same); *Yuksek v. Bondi*, No. 25-cv-2555, 2026 WL 60364, at *5 (W.D. Wash. Jan. 8, 2026) (same).

Accordingly, the Court prohibits Petitioners' re-detention unless the Government first provides written notice of the basis for the proposed re-detention and an Immigration Court hearing is held to determine whether detention is appropriate.

### 4.4    The Government bears the burden of proof by clear and convincing evidence at any of Petitioners' future pre-detention hearings.

Petitioners argue that at any future, pre-detention hearing in Immigration Court, the Government should bear the burden of proof by clear and convincing evidence. Dkt. No. 23 at 8–9. In response, the Government argues only that

1    "Petitioners fail to allege that re-detention is likely to occur without proper notice

2    and an opportunity to be heard." Dkt. No. 20 at 2. This assertion is puzzling, as the

3    Government's primary argument is that it need *not* provide pre-detention notice or

4    a hearing to Petitioners.

5        The Court agrees with Petitioners that a heightened evidentiary standard is

6    appropriate in Petitioners' cases because "each Petitioner's initial release

7    [necessarily] reflected a government determination that they were not a danger or a

8    flight risk, and it is the Government that seeks to reverse that determination and

9    reimpose confinement." Dkt. No. 23 at 8. Indeed, Petitioners' release on parole or on

10   their own recognizance could only have occurred if the Government affirmatively

11   found that they were not a danger to society or a flight risk. 8 C.F.R. § 1236.1(c)(8)

12   (authorizing certain officers to release noncitizens on conditions of release only if

13   the noncitizen has "demonstrate[d] to the satisfaction of the officer that such release

14   would not pose a danger to property or persons, and that [they are] likely to appear

15   for any future proceeding"); *see also Espinoza v. Kaiser*, Case No. 1:25-cv-01101 JLT

16   SKO, 2025 WL 2581185, at *13–14 (E.D. Cal. Sept. 5, 2025); *Martinez Hernandez v.

17   Andrews*, Case No. 1:25-CV-01035 JLT HBK, 2025 WL 2495767, at *13–14 (E.D.

18   Cal. Aug. 28, 2025).

19       Numerous courts have adopted this procedural requirement to protect non-

20   citizens' due process rights, finding it logical when, as here, "the petitioner's initial

21   release reflected a determination by the government that the noncitizen is not a

22   danger to the community or a flight risk." *Espinoza*, 2025 WL 2581185, at *14; *see,

23   e.g.*, *Pinchi*, 792 F. Supp. 3d at 1034–36; *Singh v. Noem, et al.*, Case No. 2:26-cv-

00403-GJL, 2026 WL 555397, at *3 (W.D. Wash. Feb. 27, 2026); *Subham v. Noem*, Case No. C26-292-SKV, 2026 WL 497101, at *5 (W.D. Wash. Feb. 23, 2026); *Martinez Hernandez*, 2025 WL 2495767, at *13. And ultimately, "[s]ince it is the government that initiated re-detention, it follows that the government should be required to bear the burden of providing a justification for the re-detention." *Espinoza*, 2025 WL 2581185, at *14.

The Court acknowledges that the Ninth Circuit has not yet addressed this issue. However, given the pattern of persuasive precedent and the Government's failure to address the issue, the Court finds it appropriate to require the Government to meet the clear and convincing evidentiary standard at any future pre-detention hearings for Petitioners. Similarly, because each Petitioner was previously managed under less restrictive conditions of release, the Government must demonstrate that those alternatives to detention are no longer adequate before reimposing the most restrictive option.

## 5. CONCLUSION

Accordingly, the Petition for Writ of Habeas Corpus is GRANTED as to Petitioners Jairo Espinoza Palacios, Carmen Garrido Chavarria, Evgenii Kurochkin, Zemical Mhret, Amare Mitiku, Faiz Mounther, Eduardo Penzo Croechez, Hellen Sharp Perez, and Ghezae Ukbagabir. As to these Petitioners, the Court ORDERS as follows:

1. Respondents must RELEASE Petitioners from custody within TWENTY-FOUR (24) hours of this order, subject to their most recent, pre-detention conditions of release.

2. Upon Petitioners' release, Respondents must return to Petitioners any personal property, including personal identification documents (other than a passport) and employment authorization documents;

3. Respondents are permanently enjoined from re-detaining Petitioners during the pendency of their removal proceedings absent written notice and a hearing prior to re-detention where Respondents must prove by clear and convincing evidence that each Petitioner is a flight risk or danger to the community and that no alternatives to detention would mitigate those risks;

4. Within FORTY-EIGHT (48) hours of their release, Respondents must PROVIDE the Court with a declaration confirming that Petitioners have been released from custody and informing the Court of the date and time of their releases.

5. Any fee petition should be filed within the deadlines set by the Equal Access to Justice Act, 28 U.S.C. § 2412. *See Daley v. Ceja*, 158 F.4th 1152, 1162 (10th Cir. 2025) (the Equal Access to Justice Act authorizes the award of attorney's fees to petitioners who prevail against the government in immigration habeas actions).

The Court FURTHER ORDERS that Petitioner Rahim's petition is DISMISSED without prejudice.

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS IN PART - 25

1

2    The Court FURTHER ORDERS that Petitioner Rodriguez's petition is DISMISSED without prejudice as voluntarily withdrawn.

3

4    Dated this 11th day of March, 2026 at 4:45 p.m.

5

6    Jamal N. Whitehead
     United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS IN PART - 26